# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of (1) one Apple iPhone, booked into evidence as item number 12, under LAPD case number 21-10-00733; and (2) one Apple iPhone, booked into evidence as item number 13, under LAPD case number 21-10-00733, as described in Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **2:21-MJ-03871** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g) | Felon in Possession of Firearm and Ammunition |
| 18 U.S.C. § 922(a)(1)(A) | Dealing Firearms without a License |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
*/s/ Nicholas Williams*

_____
*Applicant's signature*

ATF TFO Nicholas Williams
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: <u>Los Angeles, CA</u>

_____
*Judge's signature*

<u>Hon. Alka Sagar, United States Magistrate Judge</u>
*Printed name and title*

AUSA: Ashley Fillmore – 213-894-2416

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices, seized on May 7, 2021, and currently in the custody of the Los Angeles Police Department in Los Angeles, California (collectively, the "SUBJECT DEVICES"):

a. One Apple iPhone, unknown serial number, a blue cellular phone in a black silicone cellular phone case, booked into evidence as item number 12, under LAPD case number 21-10-00733 ("SUBJECT DEVICE 1"); and

b. One Apple iPhone, unknown serial number, a blue cellular phone in a black silicone cellular phone case, booked into evidence as item number 13, under LAPD case number 21-10-00733 ("SUBJECT DEVICE 2").

**ATTACHMENT B**

I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) and 18 U.S.C. § 922(a)(1)(A) (Dealing Firearms Without A License) (collectively, the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of guns,

including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when guns or ammunition were bought, sold, or otherwise distributed;

e. Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, possession, or distribution of guns or ammunition;

f. Contents of any calendar or date book;

g. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h. Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data

v

to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

   ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

  e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

  f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

  g.   If the search determines that the SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

  h.   If the search determines that the digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside

the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

       i.   The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

       j.   After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

    4.   The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

    5.   During the execution of this search warrant, law
enforcement is permitted to (1) depress Gonzalo RAMOS's thumb
and Douglas ESTRADA's thumb- and/or fingers onto the fingerprint
sensor of the SUBJECT DEVICES (only if the device has such a
sensor), and direct which specific finger(s) and/or thumb(s)

shall be depressed; and (2) hold the device in front of RAMOS's
face and ESTRADA's face with their eyes open to activate the
facial-, iris-, or retina-recognition feature, in order to gain
access to the contents of any such device. In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

6.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## AFFIDAVIT

I, Nicholas John Williams, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for a search warrant for the following two digital devices (collectively, the "SUBJECT DEVICES") in the custody of the Los Angeles Police Department ("LAPD") in Los Angeles, California, described in Attachment A:

a.   One Apple iPhone, unknown serial number, a blue cellular phone in a black silicone cellular phone case, booked into evidence as item number 12, under LAPD case number 21-10-00733 ("SUBJECT DEVICE 1"); and

b.   One Apple iPhone, unknown serial number, a blue cellular phone in a black silicone cellular phone case, booked into evidence as item number 13, under LAPD case number 21-10-00733 ("SUBJECT DEVICE 2").

2.   The requested warrant seeks authority to search for and seize the items described in Attachment B, namely, fruits, and instrumentalities of violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm and Ammunition) and 18 U.S.C. § 922(a)(1)(A) (Dealing Firearms Without A License) (collectively, the "Subject Offenses").

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

1

is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### BACKGROUND OF AFFIANT

4.   I am a Deputized Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), currently assigned to the Los Angeles Field Division, where I investigate cases involving the illegal use, sale, and possession of firearms and narcotics.

5.   I have been employed by the City of Los Angeles as a Peace Officer for approximately nineteen years and have held the rank of Detective for the past six years. During my tenure as a Peace Officer and a TFO, I have participated in the investigation, surveillance, and arrest of numerous firearms and drug traffickers. I have written and participated in the execution of several state and federal search and arrest warrants in investigations related to violations of federal and state firearms and narcotics laws.

6.   I have also received training in state and federal firearms and narcotics laws, confidential source handling, drug identification, and various surveillance and investigative techniques. I also consult regularly with experienced investigators concerning the methods and practices of firearms and narcotics traffickers. I have become familiar with the efforts of individuals engaged in the importation, smuggling,

2

manufacturing, distribution, and sale of firearms and narcotics
to avoid detection and apprehension by law enforcement officers.

## SUMMARY OF PROBABLE CAUSE

7.   On or about May 7, 2021, officers from the LAPD
arrested Gonzalo RAMOS ("RAMOS"), a convicted felon, and Douglas
ESTRADA ("ESTRADA"), following a traffic stop in the area of
Sherman Way and Woodley Avenue in the City of Van Nuys,
California.

8.   During the traffic stop, RAMOS advised officers, who
had already observed a firearm in plain sight in the vehicle,
that he had a firearm on his person. In addition to the loaded
.38 caliber revolver with six rounds of .38 caliber ammunition
found on RAMOS's person, officers located and seized three
additional firearms from the vehicle.

9.   The SUBJECT DEVICES were seized from the vehicle and
are currently in the custody of the LAPD.

## STATEMENT OF PROBABLE CAUSE

10.  Based on my review of law enforcement reports,
conversations with other law enforcement officers, and my own
knowledge of the investigation, I am aware of the following:

11.  I reviewed LAPD Officer Fitzpatrick's arrest report,
which stated that on May 7, 2021, at approximately 5:10 p.m.,
Officer Fitzpatrick and his partner, Officer Kim, were driving
in a marked black and white police vehicle in the area of
Sherman Way and Woodley Avenue in the City of Van Nuys,
California. At that time, they observed a gray, Mercedes-Benz,
E-Class (the "Mercedes"), with two occupants: ESTRADA, the

3

driver, and RAMOS, the front seat passenger. The Mercedes was
traveling westbound on Sherman Way with no license plates
displayed, a violation of California Vehicle Code § 5200(a).
Accordingly, the officers initiated a traffic stop on the
Mercedes.

12.  Officer Kim approached ESTRADA, seated in the driver's
seat of the Mercedes, and requested his driver's license,
vehicle registration, and vehicle insurance information. ESTRADA
then leaned over and opened the glovebox compartment of the
Mercedes to retrieve the documents. Once open, the officers
observed in plain view a black, semi-automatic, handgun lying in
the glovebox within reaching distance of RAMOS and ESTRADA. In
response, the officers directed RAMOS and ESTRADA out of the
Mercedes and detained them pending a firearms investigation.

13.  While being detained, RAMOS spontaneously stated to
Officer Fitzpatrick, "I have a gun on my waist." In response,
Officer Fitzpatrick immediately reached down to RAMOS's front
waistband and recovered a blue steel, Colt, Detective Special,
.38 caliber revolver, bearing serial number C50866, loaded with
six rounds of .38 caliber ammunition, seated in a brown leather
holster. The officers would later learn, after a computer
inquiry using a LAPD firearms database and the firearm's serial
number, that the firearm was reported stolen on May 5, 2021 from
La Quinta, California.

14.  The officers then seized the black, semi-automatic,
handgun from the Mercedes's glovebox and discovered that it was

4

a "ghost gun."[1] The ghost gun was a replica Glock 19, Polymer80, 9mm caliber, semi-automatic handgun, bearing no serial number, with a corresponding seventeen round capacity, 9mm caliber magazine. The firearm was not loaded.

15.   The officers at the scene conducted a computer inquiry, using a State of California criminal history database and the personal information provided by both RAMOS and ESTRADA, and learned that RAMOS and ESTRADA, together, were arrested on December 10, 2020 by the LAPD for firearm violations following a traffic stop. Furthermore, the computer inquiry revealed that RAMOS was a convicted felon.

16.   The officers placed RAMOS and ESTRADA under arrest for the aforementioned firearms violations and continued with the investigation.

17.   During a search of the Mercedes, the officers located and seized the following items:

a.   From between the driver's seat and the center console, a black steel, replica Glock 26, Polymer 80, 9mm caliber, semi-automatic handgun, bearing no serial number (another ghost gun), with a corresponding seventeen round capacity, 9mm caliber magazine, loaded with seventeen rounds of 9mm caliber ammunition;

b.   From the driver's side door storage pocket, a black steel, replica Glock 19, Polymer 80, 9mm caliber, semi-automatic handgun, bearing no serial number (another ghost gun),

---

[1] A "ghost gun" is a firearm bearing no serial numbers.

with a corresponding seventeen round capacity, 9mm caliber magazine. This firearm was not loaded;

      c.   From the driver's seat area, SUBJECT DEVICE 1, identified by ESTRADA as his cellular phone; and

      d.   From the front passenger area, SUBJECT DEVICE 2, identified by RAMOS as his cellular phone.

    18.  According to the arrest report, as Officer Fitzpatrick recovered SUBJECT DEVICE 2, he observed an incoming text message displayed on the screen from an individual identified in SUBJECT DEVICE 2 as "Marc." The text message read, "How much for 22lr." Based on my training, experience, and knowledge of this investigation, I understand that "22lr" is a reference to a .22 caliber long rifle or .22 caliber long rifle ammunition.

    19.  During a search of RAMOS's person, the officers discovered a purchase receipt dated April 21, 2021 from Ventura Munitions located in Las Vegas, Nevada for hundreds of rounds of ammunition in various calibers. The receipt illustrated the following cash purchase:

      a.   Challenger First Class, 12 gauge, 2.75", 1 ounce ammunition - 1 box of 25 rounds;

      b.   Federal Power-shok, 12 gauge, 2.75", 1 ounce, slug ammunition – 4 boxes of 5 rounds;

      c.   Federal Range Pack, 22LR, 40 grain, LRN ammunition – 1 box of 800 rounds; and

      d.   Piney Mountain Ammo, 22LR, 40 grain, Green Tracer ammunition – 4 boxes of 50 rounds.

20.   The officers searched ESTRADA's person and located the following items:

     a.   $630 in US currency;

     b.   A US Bank withdraw receipt in the amount of $1,500, dated May 07, 2021;

     c.   A Wells Fargo withdraw receipt in the amount of $2,000, dated May 07, 2021; and

     d.   A Wells Fargo deposit receipt in the amount of $9,820, dated May 03, 2021.

21.   The LAPD officers transported RAMOS and ESTRADA to West Valley Police Station for interviews and pre-booking procedures.

22.   According to the arrest report, ESTRADA admitted, after waiving his <u>Miranda</u> rights, to possessing the firearms located in the driver's side door and inside the center console of the Mercedes. ESTRADA added that he had just purchased the firearms that morning from an unknown individual in south Los Angeles. In addition, he gave consent to the officers to search SUBJECT DEVICE 1. The officers' initial examination of SUBJECT DEVICE 1 revealed photographs and videos from SUBJECT DEVICE 1's camera roll of RAMOS and ESTRADA possessing, shooting, and manufacturing firearms. Although the officers' initial review of SUBJECT DEVICE 1 was authorized by ESTRADA's consent, I submit this request for a federal warrant to search the SUBJECT DEVICES out of an abundance of caution, and to permit a full, forensic analysis of each of the SUBJECT DEVICES.

23.   Per the LAPD arrest report, RAMOS, after waiving his Miranda rights, admitted to possessing the firearms seized from his person and from the glovebox of the Mercedes. RAMOS added that he had purchased the firearms from an unknown individual in the San Fernando Valley. RAMOS stated to the officers when asked why he was carrying the handgun, "It's something I always gotta have on me . . . just so I have something to respond with when…it's better to get caught with one than without one."

24.   The officers booked the SUBJECT DEVICES as evidence in LAPD custody under LAPD case number 21-10-00733.

25.   On June 01, 2021, I reviewed multiple recorded phone calls of RAMOS while he was in custody at the LAPD Valley Jail. During phone calls to several individuals, RAMOS admitted to possessing firearms and ammunition.[2]

26.   For example, in a call placed on May 08, 2021, RAMOS stated, ". . . again, this time (unintelligible) . . . the gun was right on my hip." During another phone call placed by RAMOS on May 08, 2021, a female on the call stated to RAMOS, "I went to your pad and I talked to your sister." RAMOS responded, "Okay, did you tell her to get rid of everything?" The female then stated, "I just told her."

## V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

27.   From my training, personal experience, and the collective experiences related to me by other law enforcement

---

[2] The recorded telephone calls were made by an individual identifying himself as RAMOS. I am familiar with RAMOS's voice as a result of my work on this investigation, and I recognized RAMOS as the speaker.

officers who conduct firearms investigations, I am aware of the following:

   a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence or business, or in places that are readily accessible, and under their physical control, such as in their digital devices. It has been my experience that prohibited individuals who own or sell firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

   b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c.   Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with

9

each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

28. As used herein, the term "digital device" includes the SUBJECT DEVICES.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it. For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions. Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Gonzalo RAMOS's thumb- and/or fingers on the device(s) and Douglas ESTRADA's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of RAMOS's face and ESTRADA's face with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

13

32. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

33. For the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the Subject Offenses, will be found in the SUBJECT DEVICES, as described in Attachment A


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
August, 2021.


_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

14